737 A.2d 1076

**In the Matter of the Petition for REINSTATEMENT
to the Bar of Maryland OF Wendell H. GRIER.**

**Misc. (Subtitle BV) No. 51, Sept. Term, 1993.**

Court of Appeals of Maryland.

· Sept. 22, 1999.

Edward Smith, Jr., Baltimore, for petitioner.

Melvin Hirshman, Bar Counsel for the Attorney Grievance Commission of Maryland, for respondent.

Submitted to BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW,* RAKER, WILNER and CATHELL, JJ.

RODOWSKY, Judge.

This petition for reinstatement to the bar of this Court, which we shall grant, has generated differences of opinion on its way to, and in, this Court.

The petitioner, Wendell H. Grier (Grier), is a forty-eight year old alcoholic. This Court placed him on indefinite suspension by order dated June 18, 1990, based upon a joint petition filed by Grier, through counsel, and by Bar Counsel. At the end of December 1993 he petitioned for reinstatement, and we referred the matter to Bar Counsel for appropriate investigation. The investigation was completed in September 1998. It confirmed the allegations of the petition for reinstatement and developed no information adverse to Grier since his suspension. Next, a five member panel of the Inquiry Committee unanimously recommended Grier's reinstatement, subject to conditions which we shall discuss, *infra.* The Review Board, however, recommended against reinstatement, by a vote of thirteen to one. This Court has divided on the issue.

At the time of Grier's indefinite suspension by consent, a petition for disciplinary charges was pending against him. It alleged that his misconduct involved "a lack of competence and an escrow account which fell below the required balance to be held for a client." Other client complaints had been, or shortly thereafter were, made to Bar Counsel. One of these involved the failure to pay, out of a client's recovery, the client's $161 bill due to a pharmacy. The other client complaints principally involved the failure diligently to follow through on matters undertaken for clients and the failure to communicate with clients. All of the charges and client

---

* Chasanow, J., now retired, participated in the conference consideration of this petition while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

complaints involved Grier's conduct during the period when he was an active alcoholic.

The petition for indefinite suspension reveals that Grier had conferred with Richard Vincent, the Director of Lawyer Counseling for the Maryland State Bar Association, as early as 1988 and that "in the past few years" preceding the consent petition Grier had "been treated for seizures and been in a detoxification program at Greater Baltimore Medical Center." The record also reflects that between April 26 and May 8, 1990, Grier was a patient at Baltimore County General Hospital. There, his first five discharge diagnoses were: "1. Acute pancreatitis[;] 2. Seizure disorder, possibly secondary to alcohol abuse[;] 3. Acute and chronic alcoholism[;] 4. Dehydration[; and] 5. Delirium tremens with alcoholic withdrawal syndrome." When the consent petition was filed Grier was an inpatient in a thirty day detoxification program at a treatment facility. It further appears that Grier relapsed into drinking alcohol in January 1991.

Significantly, Grier has abstained from alcohol since April 1991. He attends Alcoholics Anonymous meetings on a regular basis, and his continued compliance with his program of sobriety was verified to the inquiry panel by the Director of Lawyer Counseling.

Following his suspension Grier worked for approximately one year in telemarketing prior to obtaining a position as a legal assistant at the Injured Workers' Insurance Fund, first in the claims department and, for the past three or four years, in the legal department. Grier's supervisor in the legal department testified before the inquiry panel that Grier's work product is "satisfactory" and that he "has always responded timely." Grier's previous supervisor in the claims division told Bar Counsel's investigator that Grier "has excellent work habits, [and] performs detailed and thorough legal research in performing his daily functions." Since 1992 Grier has held a license from the State of Maryland as a real estate appraiser, and he earns part-time income from work referred to him by attorneys.

The conditions under which the inquiry panel recommended Grier's reinstatement are summarized in the report of the Review Board as follows:

"(1) In accordance with Mr. Vincent's suggestions, the Panel required as a condition for termination of suspension that the Petitioner continue to attend regular meetings of Alcoholics Anonymous and that he report regularly and directly to Richard Vincent. . . .

"(2) The Panel recommended that Mr. Vincent render a written report for five (5) years from the date of an Order terminating suspension to Bar Counsel indicating Petitioner is complying with this condition for termination of suspension.[1]

"(3) The Panel recommended as another condition that *in the event Petitioner does not affiliate himself with a law firm that maintains a separate bookkeeping department,* that any escrow or trust account that the Petitioner maintains, shall be co-signed by a member of the Bar acceptable to Bar Counsel.

"(4) The Panel recommended also that a member of the Bar monitor the Petitioner's law practice with said monitoring to include a random review of a minimum of five (5) files, selected by that monitor and not by the Petitioner, on a monthly basis for eighteen (18) months and then on a quarterly basis for forty-two (42) months from the date of an Order terminating suspension. The Panel suggested that whoever undertakes the monitoring of the Petitioner's practice render quarterly reports to Bar Counsel for five (5) years from the date of this Order."

(Emphasis added).

The inquiry panel reached its recommendation for reinstatement, subject to the above conditions, after seeing and hearing from Grier, his employment supervisor, a District Court of

---

1. We interpret recommendations one and two to mean that the schedule of meetings between Grier and Mr. Vincent would be determined by Mr. Vincent in his discretion and that Mr. Vincent report to Bar Counsel after each of those meetings as to whether Grier is complying.

Maryland judge, who appeared as a character witness, and Mr. Vincent. The Review Board reached its decision based on the record. Its recommendation against reinstatement rests on three grounds. First, the Board did "not feel that the Petitioner would either accept or cooperate" with the recommended conditions. Second, the Board found "difficulties with the Petitioner's arrogance and perceived evasiveness." Third, the Board was "not convinced that the Petitioner's problems would not have occurred absent his alcoholism."

Bar Counsel recommends "[t]hat the Court take such action on the Petition as to the Court shall [s]eem just and proper." Should the Court determine to reinstate Grier, Bar Counsel recommends, as conditions, continued attendance at Alcoholics Anonymous, continued cooperation with Mr. Vincent and, "should the Petitioner engage in the private practice of law immediately or within two (2) years of reinstatement, that his practice be monitored by a member of the bar satisfactory to Bar Counsel with monthly reports for the first six (6) months and quarterly reports thereafter and under such reasonable terms of monitoring as [are] worked out between Bar Counsel and the monitor."

In this Court, three judges have dissented from reinstatement on conditions. Based on the inquiry panel's recommendation for a co-signor on escrow account checks, the dissent concludes that the reason for the condition is that Grier is not "sufficiently trustworthy to maintain an escrow or trust account without an overseer." From the premise that Grier "cannot be trusted to write checks on a trust account without a co-signor," the dissent concludes that he "is not fit to practice law in this State."

The diversity in the recommendations that we have received represents differences of opinion with respect to monitoring. The concept of monitoring is traceable in this State at least to the late 1970s when the Standing Committee on Rules of Practice and Procedure of this Court was considering rules on attorney competency and the possible creation of a complaint-oriented peer review entity. Rules Committee drafts of possi-

ble rules placed this subject in a proposed new subtitle BX of the former Special Proceedings Rules. *See* Court of Appeals Standing Committee on Rules of Practice and Procedure (Rules Committee), Minutes of June 14–15, 1977, at 1 ("Consideration of the Report of the Attorney Competency Subcommittee"). Michael J. Kelly, then Dean of the University of Maryland School of Law and a member of the subcommittee, advocated that the contemplated entity not be viewed "as a censuring, disciplinary body, but rather as one which should counsel and assist lawyers to improve their performance." *Id.* at 5. At that meeting the BX subcommittee was directed to draft rules that would "establish an informal body to provide voluntary assistance and counseling to lawyers" against whom complaints of incompetence had been filed. *Id.* at 11. About one year later a redraft of proposed BX rules was discussed by the Rules Committee. Illustrations of the type of causes for complaints concerning competence that the proponents of the BX rules envisioned were unpreparedness, inexperience, understaffing, alcoholism, family stress, poor health, and poor case-control. Rules Committee, Minutes of May 12–13, 1978, at 5.

The Board of Governors of the Maryland State Bar Association "endorsed the concept that attorney counseling is necessary and desirable to enhance the competency of practicing attorneys," Maryland State Bar Association, Inc., *Programs and Reports,* Transactions, Jan. 1979, at 15, but the M.S.B.A. Board was evenly divided over whether responsibility for the counseling function should be assigned to the Attorney Grievance Commission or placed in a new entity. Rules Committee, Minutes of Jan. 5, 1979, at 2. The proposed BX rules were never adopted. Discussion of the counseling concept, however, lead to the creation of the lawyers' counseling position in the M.S.B.A. That discussion also led to this Court's incorporation of the monitoring concept into the case law of attorney discipline in *Attorney Grievance Commission v. Bailey,* 286 Md. 630, 408 A.2d 1330 (1979).

Bailey was a criminal law practitioner who undertook to handle a real estate closing. He withheld $1,000 to cover his

fee, recordation costs, and transfer taxes, but he did not record in the Land Records instruments required to consummate the closing until almost ten months thereafter. *Id.* at 636, 408 A.2d at 1333. In the interim, he had not placed in his escrow account the money withheld to cover costs and taxes. We said that Bailey's case was one of the types of situations contemplated by the lawyer counseling proposal. *Id.* at 637, 408 A.2d at 1334. The Court suspended Bailey for three years, but with the right to apply, after thirty days of suspension, for reinstatement on conditions, one of which was that "for the remainder of the original period of suspension [Bailey] may participate in no field of the law other than the trial of criminal cases unless he is associated in each and every endeavor outside the criminal field with some other attorney or attorneys whom the Attorney Grievance Commission or its designee has previously approved." *Id.* at 638, 408 A.2d at 1335. We said that this was "as close as we are able to come at this time to the type of counseling which the Maryland State Bar Association earlier recommended." *Id.*

An alcoholic attorney who had neglected his practice was before this Court in *Attorney Grievance Commission v. Finlayson,* 293 Md. 156, 442 A.2d 565 (1982). Finlayson had "hit bottom" but had been abstaining from alcohol for approximately ten months. *Id.* at 159, 442 A.2d at 567. We suspended Finlayson indefinitely, but with the right to reapply under numerous conditions, including that he "shall be associated with another member of the bar of this Court who shall monitor his activities as a practicing lawyer. . . ." *Id.* at 160, 442 A.2d at 567.

■ Since the *Bailey* and *Finlayson* cases, it has become relatively common to require monitoring appropriate to the circumstances as a condition of reinstatement after a suspension for disciplinary violations that concern competency. Typically the requirement has stated generally that the monitor "oversee" the practice of the sanctioned lawyer. *See, e.g., Attorney Grievance Comm'n v. Brugh,* 353 Md. 475, 727 A.2d 913 (1999); *Attorney Grievance Comm'n v. Kuhn,* 353 Md.

423, 726 A.2d 1269 (1999); *Attorney Grievance Comm'n v. Perweiler,* 353 Md. 312, 726 A.2d 238 (1999); *Attorney Grievance Comm'n v. Kreamer,* 353 Md. 85, 724 A.2d 666 (1999); *Attorney Grievance Comm'n v. Domingues,* 352 Md. 395, 722 A.2d 883 (1999); *Attorney Grievance Comm'n v. Massagli,* 352 Md. 277, 721 A.2d 698 (1998). Monitoring does not infringe on client confidentiality because the client consents to disclosure to the monitor.

In *Attorney Grievance Commission v. Aler,* 301 Md. 389, 483 A.2d 56 (1984), this Court addressed a case analogous to Grier's. Aler was an attorney admitted to the bar in 1963, who was " 'generally respected as a competent trial attorney' " until he became severely alcoholic in the late 1970s. *Id.* at 396, 483 A.2d at 60 (quoting the findings of the hearing judge). After settling a personal injury suit, Aler's client asked him to hold the funds in escrow and disburse them on a monthly basis in order to cover the client's living expenses; instead of doing so, Aler commingled the funds with his operating account, failed to keep an accounting, and used the funds for his personal and office use. Aler later attempted, unsuccessfully, to account for all of the funds, but did represent the same client in subsequent matters without charging the client fees to which Aler was entitled. *Id.* at 391–94, 483 A.2d at 57–59. Aler later sought the help of Richard Vincent, the same counselor in Grier's case, who verified that Aler had been sober for almost two years and had an "excellent" prognosis for continued compliance. *Id.* at 397, 483 A.2d at 60. The Court imposed an indefinite suspension, with right to reapply after thirty days, subject to a number of conditions, including having a monitoring attorney co-sign all trust and escrow checks. *Id.* at 400, 483 A.2d at 61–62.

*See also Attorney Grievance Comm'n v. Armanas,* 336 Md. 562, 649 A.2d 1118 (1994) (indefinitely suspending attorney, and conditioning her reinstatement on "having an attorney, satisfactory to Bar Counsel, to serve as a monitor of her legal practice, including ... co-signing any attorney escrow account maintained by [her]" for a period of three years); *Attorney Grievance Comm'n v. Noonan,* 336 Md. 473, 648 A.2d 1025

(1994) (same, for a period of at least two years); *Attorney Grievance Comm'n v. Brown,* 332 Md. 451, 632 A.2d 149 (1993) (same, for a period of two years).

In *Attorney Grievance Commission v. Larsen,* 324 Md. 114, 596 A.2d 623 (1991), our order terminating the indefinite suspension of Larsen had included a condition that his monitor co-sign all escrow checks. *Id.* at 115, 596 A.2d at 623. Larsen, however, opened a second office, of which his monitor had no knowledge. In the reported decision we reimposed an indefinite suspension.

Against the foregoing background, we now address the particular concerns expressed by the Review Board. We do not conclude, from the record as a whole, that Grier will refuse to accept the conditions proposed by the inquiry panel or fail to cooperate with a monitor. He cooperated with the five year investigation by Bar Counsel's office which began after Grier was no longer actively alcoholic. Bar Counsel's investigator verified all of the information furnished by Grier. Although Bar Counsel did not expressly recommend reinstatement to the inquiry panel, he advised that group that there "were no specific factors which would cause him to recommend" that reinstatement be denied.

The issue of Grier's perceived arrogance and evasiveness, mentioned by the panel chair and by the Board, is not generated by any common ground. The panel chair stated that he "had some problems with the Petitioner's arrogance and perceived evasiveness and elusiveness," but that "the general consensus [of the entire five member panel] is that the Petitioner was as forthcoming as possible with his testimony." The panel said that Grier "was questioned directly as to his plans if he is reinstated to the practice of law and he was equivocal at best and evasive at worst." This is understandable. He has no definite plans. Indeed, it might be considered presumptuous for a suspended lawyer to assume that reinstatement is going to be granted and to plan accordingly.

The Review Board quotes from the panel hearing transcript where Bar Counsel questioned Grier about a possible condi-

tion for a co-signor on escrow account checks. Grier, in substance, replied that the proposal carried a connotation that it was necessary as "a watch for my greed, avarice or black heartedness." He said that he did not need "a watch for that because I'm not infected with that." He said that his past problems were due to his alcoholism and that they "did not arise out of some failing in my morals or my character." If such a condition was based on the belief that he could not "be trusted," then Grier would "have difficulty with that. I'd be insulted." Nevertheless, Grier stated: "I'll submit to any order that the Court of Appeals determines is necessary in my case." In our view this portion of Grier's testimony is favorable to reinstatement. Any honorable lawyer would be insulted if told that the purpose for requiring two signatures on the escrow account of the lawyer's solo practice was the belief that, otherwise, the lawyer would steal from clients.

Nor do we find arrogance in Grier's attributing his earlier misconduct to alcoholism. The joint petition for indefinite suspension by consent averred that "[t]he [Attorney Grievance] Commission believes that the misconduct of Respondent is substantially related to his dependence on alcohol and an indefinite suspension [as contrasted with disbarment] is warranted." As this Court pointed out in *In re Barton,* 273 Md. 377, 382, 329 A.2d 102, 105 (1974), "to be reinstated, one need not express 'contrition' which is inconsistent with a position to which he honestly and sincerely adheres."

The panel's recommendation for a co-signor actually was prompted by two concerns, neither of which impugns Grier's honesty. The first is possible relapse into alcoholism, and the second is Grier's lack of office management skills. Mr. Vincent, Grier's expert witness on alcohol counseling, told the panel that there was a ninety-five percent chance that Grier would never relapse into active alcoholism. It is that five percent risk which the co-signor condition addresses. Indeed, if the panel's recommendation were motivated by a concern over Grier's honesty, the panel should not have recommended reinstatement at all, as the dissenters in this Court point out. The panel, however, obviously had no concern about Grier's

honesty inasmuch as it found no need for a co-signor were Grier to be practicing in a law firm that maintains a separate bookkeeping department.[2]

The second concern of the panel was that Grier "has not established to the satisfaction of the Panel clear and convincing evidence that he is competent to handle a private practice without any guidance or assistance relating to the handling of escrow and trust accounts." Although the panel accepted that Grier's "problems were caused at least in major part by his active alcoholism," the panel also expressed "concern that [Grier] did not have the support and ... wherewithal[ ] to maintain a practice" during the period of his misconduct. He had "worked alone and had no consistent staff to speak of." The panel also noted that he neither engaged an accountant's services nor took any meaningful courses in maintaining a trust account. These concerns go to competence, not to trustworthiness; they are the type of concerns that ordinarily can be successfully addressed by monitoring.

The Review Board also was "not convinced that ... [Grier's] problems ... would not have occurred absent [his] alcoholism." This conclusion seems to relate to the panel's concern with competence described in the immediately preceding paragraph. Under the circumstances here, it is a basis for a monitoring condition, but not for denial of reinstatement. If we were to reject Grier's application for this reason we would be rejecting counseling, as contrasted with the exclusive use of disciplinary sanctions, as a method of dealing with problems of competency, particularly in office management. Counseling is a policy that we adopted at the urging of the bar and that we have sought to implement, when appropriate, for the past twenty years.

---

**2.** The mere requirement for co-signors on checks does not demonstrate that any authorized signatory is untrustworthy. Were that the case then all large law firms that, as a matter of general prudence, have a two signature requirement on checks would be composed of lawyers who should not be practicing.

■    Here, Grier has been suspended for over nine years, and the issue is whether the sanction should be continued or whether Grier should be given the opportunity, under safeguards designed to protect the public, to demonstrate that he can competently manage his law practice. Based on our independent review of the record we conclude that Grier should be given that opportunity and be conditionally reinstated. Having carefully considered the analyses presented by the inquiry panel and by the Review Board, we find the former to be more persuasive. We also are mindful that Bar Counsel does not oppose reinstatement but has presented proposed conditions acceptable to that office.

Accordingly, Grier is reinstated to the bar of this Court, subject to the conditions set forth below.

1.   Continued and regular participation in Alcoholics Anonymous for the indefinite future.

2.   Continued counseling with Richard Vincent, or his designee or successor, as counselor at the Maryland State Bar Association, at intervals and for a period to be determined by Mr. Vincent, with reports to Bar Counsel at intervals and for a period to be determined by Bar Counsel.

3.   In the event Grier engages in the private practice of law, monitoring of his practice by a member of the bar who is satisfactory to Bar Counsel and who may be a member of a firm with which Grier is associated. If Grier's private practice is as a solo practitioner, checks on Grier's escrow account shall be co-signed by the monitor. The monitor shall submit reports monthly to Bar Counsel for the first six months of monitoring, and quarterly thereafter. Monitoring shall be conducted under such other reasonable terms as are agreed upon between the monitor and Bar Counsel. The conditions of this paragraph three remain in effect until altered or terminated by further order of this Court.

4.   Grier shall pay all costs of the reinstatement investigation.

5. Grier shall attend the professionalism course required of new admittees.

**IT IS SO ORDERED.**

RAKER, WILNER and CATHELL, JJ., dissent

RAKER, Judge, dissenting:

This matter is before the Court on a petition for reinstatement to the practice of law by Petitioner Wendell H. Grier. After a hearing pursuant to Maryland Rule 16–714, Courts, Judges and Attorneys, Termination—Modification—Reinstatement, the Review Board of the Attorney Grievance Commission, in a 13–1 vote, voted to recommend denial of Grier's Petition for Reinstatement, concluding that Grier had not shown the necessary present qualifications to practice law at this time. Nonetheless, this Court has reinstated Grier as a member of the Bar of this State, with the condition that should Petitioner engage in the private practice of law within two years of his reinstatement, his practice be monitored by a member of the Bar, with monthly reports for the first six months and quarterly reports thereafter and under such reasonable terms of monitoring as worked out between Bar Counsel and the monitor. I agree with the near unanimous recommendation of the Review Board, and respectfully dissent. In my view, Petitioner has failed to satisfy his heavy burden that he presently possesses the good moral character to practice law. Based on the record before this Court, and the recommendation and findings of the Review Board and Inquiry Panel, I am unable to assure the public that this Petitioner, if he were restored to the practice of law, can be trusted to do so in a responsible and competent manner. *See In re Barton,* 273 Md. 377, 381, 329 A.2d 102, 105 (1974).

A person who has been suspended from the practice of law may file a petition in the Court of Appeals to terminate a suspension. *See* Maryland Rule 16–714(a). The Court may reserve judgment on the petition until after a hearing. If the Court reserves judgment, the rule directs Bar Counsel to conduct an appropriate investigation and to refer the petition

to an Inquiry Panel and subsequent review by the Review Board. *See* Maryland Rule 16–714(d)(2). Bar Counsel shall transmit to the Court the recommendations of the Review Board, and any evidence. *See id.* The burden is on the petitioner to establish the averments of the petition by clear and convincing proof. *See* Maryland Rule 16–714(d)(4).

The principal criteria this Court has traditionally considered in assessing whether a person should be readmitted or reinstated to the Bar are as follows:

1. The nature and circumstances of petitioner's original misconduct;

2. Petitioner's subsequent conduct and reformation;

3. Petitioner's present character; and

4. Petitioner's present qualifications and competence to practice law.

*See Reinstatement of Keehan,* 342 Md. 121, 125, 674 A.2d 510, 512 (1996); *In re Braverman,* 271 Md. 196, 199–200, 316 A.2d 246, 247 (1974).

On January 22, 1990, Bar Counsel filed a Petition for Disciplinary Action against Wendell Harry Grier, charging that Grier misused client funds and commingled funds in his escrow account. The Petition alleged violations of Maryland Rules of Professional Conduct 1.1 (Competence), 1.4 (Communication), 1.5 (Fees), 1.15 (Safekeeping Property), 1.16 (Declining or Terminating Representation), 8.1 (Bar Admission and Disciplinary Matters), and 8.4 (Misconduct), as well as of the statute governing attorney trust accounts, Maryland Code (1989, 1995 Repl.Vol., 1998 Cum.Supp.) § 10–301 to 10–307 of the Business Professions and Occupations Article. In the Petition, Bar Counsel alleged that Grier's escrow account balance fell below the amount he should have been holding for client Larry Levenson, and that checks issued on the escrow account were returned for insufficient funds. Bar Counsel further alleged that during the period of September 1, 1987 through February 29, 1988, Grier commingled funds from several estates in his general escrow account, and on various occasions drew checks from the escrow account payable to

himself, without notation regarding his entitlement to those funds. Grier failed to respond to oral and written requests of Bar Counsel for information regarding the returned checks.

Petitioner was indefinitely suspended, by consent, on June 18, 1990.[1] He was an active alcoholic at that time. Shortly after he was suspended, several additional client complaints were received by the Attorney Grievance Commission.[2] The complainants were informed that their complaints would be placed in Grier's file, to be considered when and if he applied for reinstatement.[3]

On December 29, 1993, Wendell H. Grier filed a Petition for Reinstatement in the Court of Appeals. This Court ordered an investigation and that costs in the sum of $800.00 be deposited with the Commission. The money was not received by the Commission until November 29, 1996. A hearing was held, and the Inquiry Panel recommended reinstatement, with special conditions as follows: (1) that in the event Petitioner did not affiliate himself with a law firm that maintains a separate bookkeeping department, any escrow or trust account Grier maintains be co-signed by a member of the Bar, (2) that five files a month be reviewed on a random basis for eighteen months and quarterly for forty-two months thereafter, and that whoever undertakes monitoring of his practice render quarterly reports to Bar Counsel for five years, (3) that Petitioner continue to attend Alcoholics Anonymous and that he report regularly and directly to Richard Vincent, the Director of Lawyer Counseling for the Maryland State Bar Association, and (4) that a written report for a period of five

---

1. A suspension by consent in light of allegations of escrow violations will not render the misconduct less serious than a judicial determination of the same conduct, and will not affect the test that must be satisfied to justify reinstatement.

2. In total, eight disciplinary complaints were either pending at the time of Petitioner's suspension or were subsequently received in the office of Bar Counsel.

3. These complaints were reviewed with Petitioner as part of the reinstatement Petition.

years after reinstatement be sent to Bar Counsel from Richard Vincent. As previously indicated, the Review Board voted to deny reinstatement.

Petitioner's present fitness to practice law must be considered in light of the nature and circumstances of his original misconduct. Petitioner's transgressions were of the utmost gravity—misuse of client funds and commingling of funds in his escrow account. *See In re Barton,* 273 Md. 377, 380, 329 A.2d 102, 104 (1974); *In re Lombard,* 242 Md. 202, 206, 218 A.2d 208, 211 (1966). The Board was not convinced that Petitioner's problems would not have occurred absent his alcoholism, noting that Petitioner employed no consistent staff, did not engage the services of an accountant, and had taken no courses in regard to maintaining an escrow or trust account. In addition, to aggravate matters, he failed to cooperate with Bar Counsel's investigation. Ordinarily, a member of the Bar would be disbarred for the trust account violations. *See Attorney Griev. Comm. v. Milliken,* 348 Md. 486, 519, 704 A.2d 1225, 1241 (1998); *Attorney Griev. Comm. v. Kenney,* 339 Md. 578, 587, 664 A.2d 854, 858 (1995). This Court has said that "the more serious the original misconduct was, the heavier is the burden to prove present fitness for readmission to the bar." *In re Barton,* 273 Md. at 380, 329 A.2d at 104. I agree with the conclusion of the Review Board that Petitioner has not satisfied his burden in establishing that he is presently fit to practice law.

As to Petitioner's subsequent conduct and reformation, the evidence was largely favorable. As to his present character, the Inquiry Panel noted the favorable testimony of the Honorable Askew Gatewood, but the Review Board had concerns with what they perceived as arrogance and evasiveness on the part of Petitioner. The Board noted:

A review of the complete transcript indicates that Petitioner seldom answered a direct question in a direct manner. Rather, Petitioner used a great deal of verbiage to impart very little substantive knowledge to the questions posed by the Inquiry Panel. Petitioner's response to Mr. Hirshman's question regarding the setting of conditions for reinstate-

ment appears symptomatic of a lack of insight into the underlying problems that brought him to the attention of the Attorney Grievance Commission in the first place.

Finally, both the Review Board and Inquiry Panel had concerns regarding Petitioner's present qualifications to practice law.

The Review Board believed that Petitioner had not shown the necessary qualifications to practice law at this time. The Board did not believe that Petitioner would either accept or cooperate with a monitor or the conditions suggested by the Inquiry Panel. In the Board's report, several significant observations were noted:

1. The Panel noted that this Bar has been very consistent in the harsh handling of attorneys who violate the trust of the public in misusing trust accounts.

2. Petitioner had not taken courses or classes of note regarding the maintenance of an escrow or trust account.

3. While Petitioner's misconduct may have been caused in major part by his alcoholism, both the Panel and the Review Board were not convinced that these are problems that would not have occurred absent the alcoholism.

4. Petitioner did not establish that he is presently competent to handle a private practice without guidance and assistance in relation to the maintenance of escrow and trust accounts.

5. There existed a marked paucity of evidence regarding Petitioner's present qualifications and competence. Petitioner presented no evidence that he took continuing legal education courses during the past 8 years regarding any substantive areas of law that he may go into if reinstated.

The Panel and the Board had the opportunity to view the witnesses and judge their veracity and credibility. While the final determination as to reinstatement rests with this Court, and we review the recommendation of the Board *de novo*, the findings of the Panel and the Board are entitled to some consideration, if not some measure of deference.

In the discharge of our duty and our original jurisdiction in disciplinary proceedings, this Court is charged with the responsibility to protect the public, to maintain the integrity of the legal profession and to deter other lawyers from engaging in violations of the Rules of Professional Conduct. *See Milliken*, 348 Md. at 516, 704 A.2d at 1239. There is perhaps no greater act of professional misconduct than the misuse of client funds. The Supreme Court of New Jersey noted, in *In the Matter of Wilson*, 81 N.J. 451, 409 A.2d 1153, 1154 (1979), that the rule against misappropriating client funds has its roots in the confidence and trust which clients place in their attorneys.

> Having sought his advice and relying on his expertise, the client entrusts the lawyer with the transaction—including the handling of the client's funds. Whether it be a real estate closing, the establishment of a trust, the purchase of a business, the investment of funds, the receipt of proceeds of litigation, or any one of a multitude of other situations, it is commonplace that the work of lawyers involves possession of their clients' funds. That possession is sometimes expedient, occasionally simply customary, but usually essential. Whatever the need may be for the lawyer's handling of clients' money, the client permits it because he trusts the lawyer.
>
> It is a trust built on centuries of honesty and faithfulness. Sometimes it is reinforced by personal knowledge of a particular lawyer's integrity or a firm's reputation. The underlying faith, however, is in the legal profession, the bar as an institution. No other explanation can account for clients' customary willingness to entrust their funds to relative strangers simply because they are lawyers.

How does a monitor and co-signor fit with this philosophy? Is the client told of the requirement for an overseer and a co-signor on the escrow account? And the reasons therefor?

The practice of appointing a monitor to serve as a watch person over an escrow account is, in my view, highly inappropriate. First and foremost, every member of the Bar should be sufficiently trustworthy to practice law without a monitor.

Second, there is evidence that the monitor system does not work. *See, e.g., Attorney Griev. Comm. v. Larsen,* 324 Md. 114, 596 A.2d 623 (1991) (attorney's indefinite suspension reimposed after he violated condition that a monitor co-sign all escrow checks).

I cannot conclude, based on the record before us, that we uphold our grave responsibility when we reinstate Petitioner at this time. A member of the Bar of this State should be sufficiently trustworthy to maintain an escrow or trust account without an overseer. If an attorney cannot be trusted to write checks on a trust account without a co-signer, that person is not fit to practice law in this State. I would deny the Petition for Reinstatement at this time.

Judge WILNER and Judge CATHELL have authorized me to state that they join in the views expressed herein.